**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREAT MINDS,<br><br>               Plaintiff,<br><br>     v.<br><br> JOHN WILEY & SONS, INC.,<br><br>             Defendant. | Case No. 15-cv-04884 (RJS)<br><br>ECF CASE |

**PLAINTIFF/COUNTER-DEFENDANT GREAT MINDS' MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

LAW OFFICE OF RHETT O. MILLSAPS II
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (646) 535-1137
Facsimile: (646) 355-2816

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Phone:  (212) 455-7844
Fax:  (212) 455-2502

*Attorneys for Plaintiff/Counter-Defendant Great
Minds*

## INTRODUCTION

Plaintiff/counter-defendant Great Minds and defendant/counterclaimant John Wiley & Sons, Inc. ("Wiley") agree that, in the words of Wiley's counsel, "this lawsuit centers on the parties' rights under the [2013] addendum" (the "Addendum") to the parties' written agreements dated April 17, 2012 and August 8, 2012 (the "2012 Agreements"). January 20, 2016 pre-motion conference transcript ("Jan. 20 Tr.") at 16:18-20 [Docket No. 35]. Wiley's overreaching interpretation of its rights under the Addendum, however – the basis for its first counterclaim for breach of a written contract – is foreclosed by the unambiguous, plain language of the Addendum and the related 2012 Agreements. Accordingly, for the reasons discussed below, the Court should grant Great Minds' partial summary judgment motion on the scope of the Addendum and dismiss Wiley's first counterclaim for breach of that agreement.

## ARGUMENT

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. Under New York law, the Court must first determine whether the language of the written contract is clear or ambiguous." *Casolaro v. Armstrong*, No. 10–CV–4276 (PKC), 2014 WL 7370025, *5 (E.D.N.Y. Dec. 29, 2014). "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment." *Tucker Leasing Capital Corp. v. Marin Medical Management, Inc.*, 833 F.Supp. 948, 956 (E.D.N.Y. 1993). *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir. 1996) (affirming grant of summary judgment where contract language was unambiguous).

"Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire

agreement; and where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks and citations omitted). And "New York has long adhered to the sound rule in the construction of contracts that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." *Golden Archer Investments, LLC v. Skynet Financial Systems*, 908 F.Supp.2d 526, 532 (S.D.N.Y. 2012) (Sullivan, J.) (quoting *Soroof Trading Dev. Co., Ltd., v. GE Fuel Cell Sys., LLC*, 842 F.Supp.2d 502, 510 (S.D.N.Y. Jan.24, 2012) (quoting *R/S Assoc. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (N.Y. 2002)). Thus, "parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Id.* (quoting *R/S Assoc.*, 98 N.Y.2d at 32).

Here, as the Court noted at the parties' January 20 pre-motion conference, the language of the Addendum is not ambiguous when considered in the context of paragraph 12.C of the 2012 Agreements to which it refers (*see* Jan. 20 Tr. at 13:14-18, 32:9-11). The plain language of the three written agreements, read together, shows that the Addendum gave Wiley only a narrow right to publish printed materials required to be provided under Great Minds' contracts with the State of New York and, further, that Wiley understood this narrow scope when the parties executed the Addendum. The Court should grant partial summary judgment to Great Minds and dismiss Wiley's first counterclaim for breach of the Addendum.

## I.   GREAT MINDS IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON WILEY'S FIRST COUNTERCLAIM BECAUSE THE RELEVANT WRITTEN AGREEMENTS ARE UNAMBIGUOUS

Wiley's first counterclaim for breach of the Addendum is premised on Wiley's overbroad and selective reading of the parties' unambiguous written agreements. The operative language of

2

the Addendum is as follows: "Under the terms of Paragraph 12.C. of both [2012] Agreements, the Parties hereby agree that the Publisher shall publish so-called 'quick print' book versions of the New York Project (the 'Custom Editions')." Great Minds' Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment ("SUMF") ¶ 6. The Addendum goes on to state, "The rights granted by [Great Minds] to [Wiley] for the Custom Editions are explicitly limited to the exclusive license to publish the Custom Editions in print formats…" *Id.*

Wiley asserts that the Addendum thereby gives Wiley the exclusive "right to publish versions of the books that were *sold in New York*" throughout the world and for the full term of their copyright registrations, and that Wiley's "right is *not* limited to publishing print versions of the books *for New York schools.*'" Parties' Feb. 1, 2016 Joint Letter to Court at 3 (emphasis in original) [Docket No. 33]. On this basis, Wiley's first counterclaim against Great Minds alleges that "Great Minds breached the Addendum in 2015 by self-publishing the Teacher Editions and selling or otherwise distributing the Teacher Editions for monetary gain" in Tennessee and elsewhere "in violation of Wiley's exclusive rights and without any payment to Wiley." Wiley's Counterclaims ¶ 35 [Docket No. 11].

As the Court noted at the pre-motion conference, Wiley's interpretation "seems to ignore the first clause or first phrase of the Addendum," which makes clear that the Addendum is to be understood as originating "[u]nder the terms of Paragraph 12.C. of both [2012] Agreements…" Jan. 20 Tr. at 22:1-2; SUMF ¶ 4.

Paragraph 12.C. of the April 17, 2012 agreement provides:

> *If [Great Minds] is awarded publishing contracts under the New York Project* as described in Paragraph 11.A.v. [*sic*] above *and the terms of such awarded publishing contracts (i) require publication of materials in book or other print format, (ii) give [Great Minds] the sole discretion to choose the publisher of such materials and (iii) do not otherwise restrict [Great Minds] so that the following is not reasonably practicable*, [Great Minds] and [Wiley] agree to

negotiate in good faith with respect to mutually agreeable terms and conditions for Publisher to act as publisher on the book or other print format publications *resulting from such awarded publishing contracts*. If [Great Minds] and [Wiley] are unable to agree upon terms within twenty-one (21) days following the date that [Great Minds] requests an offer from [Wiley] for such book or other print format publishing contracts, then [Great Minds] may offer such rights to third parties.

SUMF ¶ 7 (emphasis added). The term "New York Project," which is referenced in both the Addendum and in Paragraph 12.C. of the 2012 Agreements, is defined in paragraph 11.A.vi. of the April 17, 2012 agreement as follows: "[Great Minds] has submitted *certain proposals for contracts with the New York State Education Department* to create and develop curriculum modules and additional curriculum resources in mathematics for grades PreK-2 and 3-5 aligned with New York's Common Core Learning Standards (the 'New York Project')." SUMF ¶ 8.

The contract language indicates that Great Minds had applied for, but not yet been awarded, contracts to provide certain math curriculum materials to the State of New York, and the provision required that Great Minds negotiate in good faith with Wiley for the right to publish those print materials in connection with any such contracts if they were awarded by New York and if certain conditions were met.

Paragraph 12.C. of the subsequent August 8, 2012 agreement between the parties – also referenced in the first clause of the Addendum – indicates that Great Minds had been awarded the New York Project contracts by that point and provides as follows:

> If the terms of the New York Project, *or the terms of any comparable contracts based on the materials in the Work awarded by other school districts in the future* (i) require publication of materials in book or other print format, (ii) give [Great Minds] the sole discretion to choose the publisher of such materials and (iii) do not otherwise restrict [Great Minds] so that the following is not reasonably practicable, [Great Minds] and [Wiley] agree to negotiate in good faith with respect to mutually agreeable terms and conditions for [Wiley] to act as publisher of the book or other print format publications *resulting from such contracts*. If [Great Minds] and [Wiley] are unable to agree upon terms within twenty-one (21) days following the date that the [Great Minds] requests an offer from [Wiley] for

4

such book or other print format publishing contracts, then [Great Minds] may
offer such rights to third parties.

SUMF ¶ 9 (emphasis added).

Thus, it is clear that the Addendum – negotiated and executed by the parties on August

21, 2013 (a year after the second of the two 2012 Agreements) – gave Wiley the narrow right to

publish "'quick-print' book versions of" the materials that Great Minds was required to provide

to school districts in New York under the terms of its contracts with the New York State

Education Department. It is likewise clear that Wiley's rights under the Addendum were limited

to providing books required under those New York contracts, and that Wiley was required to

negotiate in good faith with Great Minds for the right to publish materials required by "the terms

of any comparable contracts based on the materials in the Work awarded by other school districts

in the future…" SUMF ¶ 9. As the Court aptly put it:

> So if the terms of the New York project contract or other contracts that are
> entered in the future require the publication of I guess quick print books like this,
> then certain things follow. But it would seem to me that the condition is that there
> be the execution of contracts and that the contracts require these productions…So
> it seems to me that the language of 12(c) is that if the contract, in the case of New
> York, which is the only one contemplated, requires quick print publications, then
> those will be handled as contemplated under 12(c). But I don't see where you
> could interpret this to say it also allows us to use what we produced for New York
> as part of a broader marketing strategy all over the country.

Jan. 20 Tr. at 12:10-15.

Accordingly, the Court should reject Wiley's interpretation of the agreements that

selectively ignores clauses in the Addendum and paragraph 12.C. of the 2012 Agreements, grant

Great Minds' partial summary judgment motion on the plain meaning of the parties' agreements,

and dismiss Wiley's first counterclaim for breach of the Addendum. *See Tucker Leasing*, 833 F.

Supp. at 956; *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (citations and quotations omitted)

("an interpretation of a contract that has the effect of rendering at least one clause superfluous or

meaningless...is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect").

## II.   THE CONTRACTS THEMSELVES SHOW THAT WILEY UNDERSTOOD THAT THE ADDENDUM GRANTED FAR NARROWER RIGHTS THAN THE 2012 AGREEMENTS

Moreover, it is clear from comparing other plain terms in the parties' written agreements that the parties understood that the Addendum was a narrow contract meant to address an immediate need in New York, rather than a long-term contract granting Wiley rights broad in territory and into the future:

*First*, the Addendum by its plain terms does not grant Wiley the right to publish all book or print versions of the New York Project materials, but rather grants Wiley only the right to publish "'quick-print' book versions of the New York Project" (short-handed as "Custom Editions" in the Addendum). SUMF ¶ 6.

*Second*, the Addendum unusually requires that Great Minds "deliver the Custom Editions in the form of final electronic files" that "shall be four-color files in .pdf format and shall include the dedication page (if any) through the index (if any), including text and illustrative material, all design elements and graphics" – in other words, print-ready files. SUMF ¶ 10. This is in stark contrast to the 2012 Agreements, which *do* give Wiley exclusive rights to publish certain materials nationwide into the future, and which accordingly *do not* require that Great Minds do the publisher's work to finalize the manuscripts, but rather (i) set out different requirements for manuscript delivery, (ii) provide that Wiley "shall arrange for copy-editing of the Works at [Wiley's] sole cost and expense, following any substantive editing of the Work and prior to preparing page proofs," and (iii) provide that Wiley "shall have the sole responsibility and

6

obligations for the cost of development…'Cost of development,' as used herein, includes, without limitation, the cost of copyediting, artwork, photography and related art services, from concept stage to final product…" SUMF ¶ 11.

*Third*, the Addendum's requirement that Great Minds provide Wiley with print ready files accords with the Addendum's provision that Wiley will pay certain percentages of sales to Great Minds but "may not charge any deductions accounted to [Great Minds] under the Agreements or any other agreements between the parties against the royalties for the Custom Editions" – which makes sense because Great Minds was required under the Addendum's terms discussed above to bear all of the costs to finalize the materials for printing and to turn over final, print-ready files to Wiley. SUMF ¶ 12. This is in contrast to the 2012 Agreements, which provide that Wiley will pay Great Minds certain percentages of Wiley's "net dollar receipts" – which allow for various deductions from gross receipts by Wiley – for sales of the materials under those agreements, under which Wiley was taking on a traditional, longer term publishing role in which Wiley bore responsibility for preparing and finalizing the materials for printing. SUMF ¶¶ 13, 11.

*Fourth*, the Addendum provided that Wiley would pay Great Minds a grant of only $5,000 "for use in preparing and distributing the final electronic files" in connection with the New York Project. SUMF ¶ 15. This also is in stark contrast to the 2012 Agreements, which required Wiley to pay Great Minds grants totaling $40,000 in addition to advances totaling $340,000, commensurate with the grant to Wiley of publication rights nationwide for a term into the future for the materials covered under those agreements. SUMF ¶ 14.

For these reasons – the Addendum's limitation to "quick-print" book versions of printed materials required under the New York contracts, the Addendum's unusual provisions requiring

that Great Minds prepare, finalize, and hand over print-ready files to Wiley and accordingly

eliminating cost deductions by Wiley, and the small $5,000 grant provided by Wiley under the

Addendum – it is clear from comparing the plain language of the Addendum and the 2012

Agreements that Wiley understood that the Addendum was a narrow contract meant to address

an immediate need in New York, rather than a long-term contract granting Wiley rights broad in

territory and into the future.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment to Great

Minds on Wiley's first counterclaim for breach of the Addendum because the plain,

unambiguous language of the parties' written agreements, read together, show that the

Addendum gave Wiley rights far narrower than Wiley has asserted.

Dated: February 16, 2016
     New York, New York          Respectfully submitted:


LAW OFFICE OF RHETT O. MILLSAPS II    SIMPSON THACHER & BARTLETT LLP


By:   s/ Rhett O. Millsaps II         By:   s/ Christopher Jon Sprigman

Rhett O. Millsaps II             Christopher Jon Sprigman
745 Fifth Avenue, Suite 500         425 Lexington Avenue
New York, NY  10151            New York, NY 10017
Phone:  (646) 535-1137          Phone:  (212) 455-7844
Fax:  (646) 355-2816            Fax:  (212) 455-2502
Email:  rhett@rhettmillsaps.com     Email:  christopher.sprigman@sbtlaw.com

*Attorneys for Plaintiff/Counter-defendant Great Minds*