UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREAT MINDS,

     Plaintiff,

-v-

JOHN WILEY & SONS, INC.,

     Defendant.

JOHN WILEY & SONS, INC.,

     Counter-claimant,

-v-

GREAT MINDS,

     Counter-defendant.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/2/16

No. 15-cv-4884 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

  Plaintiff Great Minds brings this action against Defendant John Wiley & Sons, Inc. ("Wiley"), alleging that Wiley infringed Great Minds' intellectual property rights in teacher editions of certain math-related educational materials by reproducing and selling the editions on its website and elsewhere, in violation of the Copyright Act of 1976, 17 U.S.C. § 101 et seq.; the Lanham Act, 15 U.S.C. § 1051 et seq.; and New York state law. (Doc. No. 1 at 1.) Wiley has filed counterclaims against Great Minds for breach of written contract, breach of implied contract, and unjust enrichment (Doc. No. 11 at 18–21), alleging that, after Wiley worked with Great Minds to secure the approval of the teacher editions for use in Tennessee, Great Minds refused to allow Wiley to sell the books in Tennessee, refused to reimburse Wiley for the costs it incurred in

securing the approval, and instead distributed and sold the editions in Tennessee on its own, in violation of an agreement between the parties (*id.* at 12).

Now before the Court is Great Minds' motion for summary judgment on Wiley's first counterclaim for breach of written contract. (Doc. No. 37.) Great Minds argues that Wiley's purported contractual publication rights are unsupported by the plain, unambiguous language of the parties' written agreements. (*Id.*) For the reasons set forth below, the Court agrees with Great Minds' interpretation of the contractual obligation at issue and grants the motion.

I. BACKGROUND[1]

On April 17, 2012 and August 8, 2012, Great Minds and Wiley executed written agreements granting Wiley exclusive authorization to publish and sell certain math-related educational materials created by Great Minds (the "Agreements"). (Pl. 56.1 Stmt. ¶ 4; *see also* Millsaps Decl. Ex. A ("Apr. 17 Agreement"); Millsaps Decl. Ex. B ("Aug. 8 Agreement").) On August 21, 2013, Great Minds and Wiley executed a written addendum to the Agreements (the "Addendum") (Pl. 56.1 Stmt. ¶ 5), which granted Wiley the right to "publish so-called 'quick print' book versions of the New York Project (the 'Custom Editions')."[2] (Millsaps Decl. Ex. C ("Addendum") at 1.) The "New York Project" is defined in Paragraph 11.A.vi. of the April 17, 2012 agreement to include "certain proposals for contracts with the New York State Education

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 statements submitted in connection with Great Minds' motion for partial summary judgment. (Doc. No. 42 ("Pl. 56.1 Stmt."); Doc. No. 45 ("Def. 56.1 Stmt.").) Unless otherwise noted, where only one party's 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding Great Minds' motion, the Court has also considered Great Minds' memorandum of law in support of its motion (Doc. No. 41 ("Pl. Mem.")), Wiley's memorandum in opposition (Doc. No. 44 ("Def. Mem.")), Great Minds' reply (Doc. No. 48 ("Pl. Reply")), the declaration of Rhett O. Millsaps II in support of Great Minds' motion (Doc. No. 43 ("Millsaps Decl.")), and the declarations of Allison S. Brehm and Kate Bradford in support of Wiley's opposition to Great Minds' motion (Doc. Nos. 46, 47).

[2] Wiley refers to these "'quick print' book versions" as the "Teacher Editions" (Def. Mem. at 5 n.3), while Great Minds and the Addendum refer to them as the "Custom Editions" (Pl. Reply at 2 n.3). Because the Addendum refers to the books at issue as "Custom Editions," the Court also uses that term.

Department to create and develop curriculum modules and additional curriculum resources in mathematics for grades PreK–2 and 3–5 aligned with New York's Common Core Learning Standards (the 'New York Project')." (Apr. 17 Agreement ¶ 11.A.vi.) Paragraph 11.A.vi. of the August 8, 2012 agreement similarly defines the "New York Project" to include "certain contracts with the New York State Education Department to create and develop curriculum modules and additional curriculum resources in mathematics for grades 6–8 and 9–12 aligned with New York's Common Core Learning Standards (the 'New York Project')." (Aug. 8 Agreement ¶ 11.A.vi.) The "New York Project" thus encompasses both "proposals for" and "awarded" contracts relating to Great Minds' creation and development of certain educational materials for the New York State Education Department.

In connection with the New York Project contracts, the Addendum grants Wiley a publication right "[u]nder the terms of Paragraph 12.C. of both Agreements." (Addendum at 1.) Paragraph 12.C. of the April 17, 2012 agreement states:

> If [Great Minds] is awarded publishing contracts under the New York Project as described in Paragraph 11.A.v. [sic[3]] above and the terms of such awarded publishing contracts . . . require publication of materials in book or other print format . . . , [Great Minds] and [Wiley] agree to negotiate in good faith with respect to mutually agreeable terms and conditions for [Wiley] to act as publisher on the book or other print format publications resulting from such awarded publishing contracts. . . .

(Apr. 17 Agreement ¶ 12.C.)[4] Paragraph 12.C. of the August 8, 2012 agreement is similar but, importantly, adds the italicized language below:

> If the terms of the New York Project, *or the terms of any comparable contracts . . . awarded by other school districts in the future . . .*

---

[3] The reference to Paragraph 11.A.v. – as opposed to 11.A.vi. – appears to be a typographical error, since 11.A.v. does not reference the "New York Project," while 11.A.vi. sets forth a definition of that term. The parties do not suggest otherwise.

[4] The Court omits above and below certain other conditions of the parties' agreement that are not relevant to the instant motion.

> require publication of materials in book or other print format . . . , [Great Minds] and [Wiley] agree to negotiate in good faith with respect to mutually agreeable terms and conditions for [Wiley] to act as publisher on the book or other print format publications resulting from such contracts. . . .

(Aug. 8 Agreement ¶ 12.C. (emphasis added).) Thus, while both Agreements contemplate the parties' negotiating a publication right for Wiley if the New York Project contracts "require publication of materials in book or other print format," the August 8, 2012 agreement contemplates the negotiation of an additional publication right for Wiley if future contracts with other school districts require publication of such materials.

Great Minds initiated this action by filing a complaint on June 23, 2015, asserting claims for copyright infringement, federal trademark infringement, unfair competition and false designation of origin, false advertising, deceptive trade practices, and unfair competition. (Doc. No. 1.) On August 17, 2015, Wiley answered the complaint and filed counterclaims against Great Minds, as described above, alleging that Great Minds has sold and distributed the Custom Editions in Tennessee and possibly other states in violation of Wiley's exclusive right under the Addendum. (Doc. No. 11.) In asserting its first counterclaim, breach of written contract, Wiley relies only on its rights resulting from the New York Project contracts; Wiley does not contend that its publication right arises from the Agreements' provisions concerning future contracts with other school districts. (*See* Def. Mem. at 6.)

On February 16, 2016, Great Minds filed a motion for summary judgment on Wiley's first counterclaim (Doc. No. 37), arguing that the Addendum granted Wiley "only a narrow right to publish printed materials required to be provided under Great Minds' contracts with the State of New York" (Pl. Mem. at 2). By contrast, Wiley argues that the Addendum granted it the broader right to publish the "curriculum modules aligned with New York's Common Core Learning Standards" (Def. 56.1 Stmt. ¶ 25) "for the term of the copyright (and all renewals and extensions)

4

throughout the world" (Def. Mem. at 3 (capitalization omitted)). The motion was fully briefed on March 16, 2016 (Doc. No. 48).

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely

disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### III. DISCUSSION

Under New York law, contractual interpretation on a summary judgment motion takes place in two stages.[5] First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous. *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (internal quotation marks omitted). If a court concludes that the contractual terms are "complete, clear, and unambiguous," it must proceed to interpret those terms according to their "plain meaning." *Id.* However, if a court finds that the contractual language is ambiguous, then it should typically deny summary judgment. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000). Nevertheless, a court may proceed to the second stage and "resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide [to] the contrary," or if the nonmoving party

---

[5] The Agreements contain New York governing law provisions (Apr. 17 Agreement ¶ 14; Aug. 8 Agreement ¶ 14), and while the Addendum contains no governing law provision, it nevertheless provides that "[a]ll other terms of the Agreements remain in full force and effect" (Addendum at 2). Accordingly, the Court applies New York law.

"fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id.*

Based on the Court's review of the relevant provisions in the Agreements and the Addendum, it is clear from the plain language of those provisions that, as Great Minds argues, the Addendum "gave Wiley only a narrow right to publish printed materials required to be provided under Great Minds' contracts with the State of New York." (Pl. Mem. at 2.) To begin with, the Addendum provides that Wiley's publication right arises "[u]nder the terms of Paragraph 12.C. of both Agreements." (Addendum at 1.) In both Agreements, the relevant portions of Paragraph 12.C. require the parties to negotiate a publication right for Wiley if "the terms of [the New York Project] publishing contracts . . . *require* publication of materials in book or other print format" – specifically, a right for Wiley to "act as publisher on the . . . publications resulting from such contracts." (Aug. 8 Agreement ¶ 12.C. (emphasis added); *see also* Apr. 17 Agreement ¶ 12.C.) Accordingly, Wiley's right under the Addendum to publish the Custom Editions, when read as arising "[u]nder the terms of Paragraph 12.C. of both Agreements," is the right to publish the Custom Editions as *required* by the New York Project contracts.

Wiley nevertheless argues that "Great Minds granted Wiley the exclusive right to publish" the Custom Editions "throughout the world," including in Tennessee. (Def. Mem. at 3 (capitalization omitted).) If the Addendum contained no reference to Paragraph 12.C. of the Agreements and instead simply stated that the parties agreed Wiley would publish "'quick print' book versions of the New York Project" (Addendum at 1) (i.e., the Custom Editions), Wiley might have an argument that the Addendum is ambiguous. As explained above, the "New York Project" comprises Great Minds' contracts with New York "to create and develop" certain educational materials. (Apr. 17 Agreement ¶ 11.A.vi.; Aug. 8 Agreement ¶ 11.A.vi.) Thus, absent the

reference to Paragraph 12.C. of the Agreements, the Addendum's granting of a right to publish "'quick print' book versions" of the materials "create[d] and develop[ed]" by Great Minds pursuant to the New York Project contracts could be interpreted as a right to publish those materials "throughout the world" (Def. Mem. at 3), and not simply to the extent called for by the New York Project contracts. When read in conjunction with Paragraph 12.C. of the Agreements, however, the Addendum gives Wiley the more limited right to publish the "'quick print' book versions" as required by the New York Project contracts. Thus, in asserting that "the grant in the Addendum translates to an exclusive right to publish [Great Minds'] *'curriculum modules . . . aligned with New York's Common Core Learning Standards*" (Def. Mem. at 7), Wiley borrows language from Paragraph 11.A.vi. – a paragraph that says nothing about Wiley's publication right – and simply ignores Paragraph 12.C., which makes clear that Wiley's publication right arises out of what the New York Project contracts "require."

This conclusion is bolstered by the fact that Paragraph 12.C. of the August 8, 2012 agreement separately obligates Great Minds (if certain conditions are met) to negotiate a publication right for Wiley in connection with contracts "awarded by other school districts in the future." (Aug. 8 Agreement ¶ 12.C.) If the Addendum granted Wiley the right to publish the Custom Editions "throughout the world," as Wiley argues (Def. Mem. at 3), this provision regarding future contracts with other school districts would be superfluous. Wiley's interpretation of the Addendum accordingly is disfavored under well-settled principles of New York contract law. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and

effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." (citation and internal quotation marks omitted)).

The Court also rejects Wiley's argument that its broad territorial rights for the publications covered by the Agreements support Wiley's expansive reading of the publication right conveyed by the Addendum. (Def. Mem. at 7.) Wiley bases this argument on the fact that the Agreements extend Wiley's publication right for the covered works "throughout the world" (Apr. 17 Agreement ¶ 1.A.; Aug. 8 Agreement ¶ 1.A.), and the fact that the Addendum is silent as to territorial rights and provides that "[a]ll other terms of the Agreements remain in full force and effect" (Addendum at 2). (Def. Mem. at 7.) But as explained above, the plain language of the Addendum entitles Wiley to publish the "quick print" materials as required by the New York Project contracts. This right obviously is limited by whatever the New York Project contracts "*require*." The Court accordingly finds Wiley's interpretation of its publication right under the Addendum to be inconsistent with the plain, unambiguous meaning of the terms of the Agreements and the Addendum. Because the Court finds the relevant provisions of these agreements to be unambiguous, it does not address the parties' arguments that rely on extrinsic evidence. *See Law Debenture Trust Co.*, 595 F.3d at 466 ("'[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous'" (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002))).

Wiley also contends in a footnote in its brief and in its 56.1 statement that it "believes that Great Minds is selling or distributing the Teacher Editions to over 46 schools in New York" in violation of Wiley's exclusivity agreement. (Def. 56.1 Stmt. ¶ 46, *cited in* Def. Mem. at 13 n.9.) This assertion, if true, would likely create a dispute as to whether Great Minds sold or distributed the "Teacher Editions" (i.e., the Custom Editions) to New York schools in violation of Wiley's

exclusive right, even under the Court's narrow interpretation of the Addendum. However, the mere assertion of "belief," without any citation to the record or otherwise admissible evidence, is not enough to defeat Great Minds' summary judgment motion. Wiley bases this more limited assertion of breach on a declaration submitted by Kate Bradford, a Wiley employee, in which Ms. Bradford simply avers that she "believe[s] that Great Minds is selling or distributing the Teacher Editions to over 48 schools in New York." (Doc. No. 47, Bradford Decl. ¶ 31.) However, because "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed. R. Civ. P. 56(c)(4), Ms. Bradford's conclusory statement of belief is insufficient to create a genuine dispute of material fact. *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[Rule 56]'s requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.' . . . Nor is a genuine issue created merely by the presentation of assertions that are conclusory.")

Accordingly, the Court finds that Wiley's alleged breach of written contract is unsupported by any admissible evidence and that Great Minds is therefore entitled to summary judgment on Wiley's first counterclaim.

IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Great Minds' motion for summary judgment on Wiley's first counterclaim is granted. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 37. IT IS FURTHER ORDERED THAT, by September 9, 2016, the parties shall submit a joint letter to the Court

proposing next steps in this action, along with a revised proposed case management plan and scheduling order.

SO ORDERED.

Dated:  September 2, 2016
        New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE